## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Q.K., et al.,                                        *

    Plaintiffs                                   *

    v.                                            *                **CIVIL NO. JKB-21-0283**

JACK R. SMITH, et al.,                              *

    Defendants.                                   *

    *    *    *    *    *    *    *    *    *    *    *    *

### MEMORANDUM

On February 3, 2021, Plaintiffs Q.K., a minor, and his parents S.M. and J.K. (the "Parents" and collectively with Q.K., "Plaintiffs") filed a Complaint against Defendants Jack R. Smith, then-Superintendent of Montgomery County Public Schools, and the Montgomery County Board of Education (collectively, "Defendants") alleging various violations of the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.* (*See* Compl., ECF No. 1.) Specifically, Plaintiffs seek review of the decision of Administrative Law Judge Robert B. Levin of the Maryland Office of Administrative Hearings (the "ALJ") denying "the Parents' request for placement at and reimbursement for tuition, costs and expenses at the Lab School of Washington for the 2019-2020 or the 2020-2021 school years" (the "ALJ Decision"). (*See* ALJ Decision at 86.)[1] Pending before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 16) and Defendants' Cross Motion for Summary Judgment (ECF No. 17). These Motions are now ripe for review and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that

---

[1] The Administrative Record (ECF No. 13) was filed only in paper format. Accordingly, when citing specific documents contained in the Record, the Court refers to the document by name.

follow, Plaintiffs' Motion for Summary Judgment (ECF No. 16) will be DENIED and Defendants'

Cross Motion for Summary Judgment (ECF No. 17) will be GRANTED.

## I. *Background*

### a. *The Individuals with Disabilities Education Act*

"In enacting the IDEA, Congress recognized that disability is a 'natural part of the human

experience' and that '[i]mproving educational results for children with disabilities is an essential

element of our national policy of ensuring equality of opportunity, full participation, independent

living, and economic self-sufficiency for individuals with disabilities.'" *M.M. ex rel. J.M. v.*

*Foose*, 165 F. Supp. 3d 365, 368 (D. Md. 2015) (citing 20 U.S.C. § 1400(c)(1)). The IDEA "offers

[s]tates federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph*

*F. v. Douglass Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017); *see generally* 20 U.S.C. § 1400

*et seq.* Among the conditions with which a state must comply in order to qualify for federal

funding is a requirement that participating states "provide a free appropriate public education" (a

"FAPE") "to all eligible children." *Id.* (citing § 1412(a)(1)). A FAPE includes "special

education"—"specially designed instruction, at no cost to parents, to meet the unique needs of a

child with a disability"—and "related services"—"such developmental, corrective, and other

supportive services . . . as may be required to assist a child with a disability to benefit from special

education[.]" §§ 1401(9), 1401(26), 1401(29). The IDEA also imposes a least restrictive

environment ("LRE") requirement:

> [t]o the extent appropriate, children with disabilities . . . are educated with children
> who are not disabled, and special classes, separate schooling, or other removal of
> children with disabilities from the regular educational environment occurs only
> when the nature or severity of the disability of a child is such that education in
> regular classes with the use of supplementary aids and services cannot be achieved
> satisfactorily.

§ 1412(a)(5)(A).

2

Under the IDEA, a participating state provides a FAPE to an eligible student "in conformity with the [student's] individualized education program" ("IEP"). § 1401(9). An IEP team composed of the student's parents and a number of teachers and other school representatives, *see* § 1414(d)(1)(B), engages in a collaborative process to ensure that the services provided for in the IEP "are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 993 (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982)). A student's IEP must include, *inter alia*, "the child's present levels of academic achievement and functional performance"; "measurable annual goals, including academic and functional goals"; "the special education and related services and supplementary aids and services . . . to be provided to the child"; and "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class[.]" *See* §§ 1414(d)(1)(A)(i)(I), (II), (IV), (V).

If the parent(s) or school officials involved in the IEP process disapproves of the student's IEP, they "shall have an opportunity for an impartial due process hearing" conducted by the state or local educational agency. § 1415(f)(1)(A). In Maryland, these due process hearings are conducted by an ALJ with the Maryland Office of Administrative Hearings ("OAH"). *See* Md. Code. Ann., Educ. § 8-413. "Any party aggrieved by the ALJ's decision may thereafter bring suit in the United States District Court for the District of Maryland or in the circuit court for the county in which the child resides." *Foose*, 165 F. Supp. 3d at 369 (citing 20 U.S.C. § 1415(i)(2)(A) and Md. Code. Ann., Educ. § 8-413(j)). The court reviewing the ALJ's decision is charged with evaluating whether the state has complied with the procedural and substantive requirements of the IDEA. *See Rowley*, 458 U.S. at 206–07 ("[A] court's inquiry in suits brought under [the IDEA] is twofold.").

3

"When a public school system defaults on its obligations under the IDEA, a private school placement may be proper if the placement is reasonably calculated to accord the child educational benefits; in such a case, the school system may be required to reimburse parents for private tuition[.]" *Foose*, 165 F. Supp. 3d at 370; *see also* 20 U.S.C. § 1415(i)(2)(C)(iii) (stating that a district court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate"). That said, parents who "'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials' . . . are entitled to reimbursement *only* if a federal court concludes both that the public placement violated the IDEA and that the private school placement was proper under the Act." *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993) (emphasis in original) (quoting *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373–74 (1985)); *see also J.R. v. Smith*, Civ. No. DKC-16-1633, 2017 WL 3592453, at \*2 (D. Md. Aug. 21, 2017). Therefore, if a reviewing court concludes that the state complied with the IDEA's procedural and substantive requirements in developing the student's IEP, the analysis ends and reimbursement will be denied. *See Foose*, 165 F. Supp. 3d at 370.

### b. *Factual Background*[2]

Q.K. was thirteen years old at the time the Complaint was filed on February 3, 2021 and is eligible to receive special education services under the IDEA. (*See* Compl. ¶¶ 3, 6; Defs.' Cross Mot. Summ. J. Mem. Supp. at 1, ECF No. 17-1.) He "has been diagnosed with Attention Deficit

---

[2] At the summary judgment stage, the Court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007) (internal citations and quotations omitted); *see also Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). "Because Plaintiffs and Defendants have each moved for summary judgment, the Court must consider each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Foose*, 165 F. Supp. 3d at 370 n.4 (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). The Court is of the opinion that Defendants are entitled to summary judgment, and will accordingly view "the facts and inferences to be drawn therefrom . . . in the light most favorable to Plaintiffs." *Id.*

Hyperactivity Disorder-Combined Type ("ADHD"), a Mixed Anxiety and Depressive Disorder, and a Specific Learning Disability with impairment in reading, written expression, and [m]athematics."[3]  (Compl. ¶ 7.)  Q.K. was also born with Shwachman-Diamond Syndrome ("SDS")—a rare genetic disorder that affects fewer than one thousand people worldwide and causes "bone marrow failure and pancreatic insufficiency"—which has caused Q.K. to have short stature and causes him to suffer "intermittent neutropenia (low white blood cells), pancreatic insufficiency, . . . and asthma." (*Id.* ¶ 8.)

Q.K. "qualified for and received services through" the Montgomery County Public Schools ("MCPS") Infant/Toddler program when he was a toddler, and between the ages of two and three attended the Quality Time Early Learning Center at Takoma Park Elementary School. (Pls.' Mot. Summ. J. Mem. Supp at 3; *see* ALJ Decision at 7.)  He then attended Lowell School ("Lowell") in Washington, D.C.—"a private, independent school that accommodates children with special needs as part of its general education program"—for three years. (Compl. ¶ 10; *see also* ALJ Decision at 7.)  While he was a student at Lowell, Q.K. received individualized support from a "reading specialist five days per week" in addition to "developmental curriculum, adult support, and accommodations in his program." (Compl. ¶ 10.)

When Q.K. was in the second grade, the Parents and his teachers concluded that the Lowell program was not sufficiently specialized for Q.K. to continue to the third grade. (Compl. ¶ 11; ALJ Decision at 7.)  The Parents contacted Piney Branch Elementary ("Piney Branch")—Q.K.'s local MCPS school—to explore his eligibility for special education services there, but they ultimately decided to enroll Q.K. in the Lab School ("Lab") for third grade in the 2016–17 school year. (Compl. ¶¶ 12–14.)  A special education coordinator at Piney Branch told the Parents that

---

[3] In their Cross Motion for Summary Judgment, Defendants also specify that Q.K.'s learning disability affects his "attention" and "social-emotional" skills. (Defs.' Cross Mot. Summ. J. Mem. Supp. at 3.)

Lab—which is a "private, special education day school in Washington, D.C. for children with significant learning disabilities, language disorders, attention disorders, and executive dysfunction"—would be a better fit for Q.K. "because of his significant special learning needs." (Pls.' Mot. Summ. J. Mem. Supp at 4; *see* ALJ Decision at 8.)

Since Q.K. began his time at Lab, a number of IEPs have been developed on his behalf. (*See, e.g.*, Pls.' Exs. P-5, P-7, P-11.)  Most recently, Lab finalized an IEP on October 21, 2019. (*See* Pls.' Ex. P-22; Defs.' Ex. 19.)  That plan included 29.67 hours per week of special education instruction, integrated speech/language and occupational services, and 160 minutes per month each of individual and group psychological services.  (Pls.' Ex. P-22; Defs.' Ex. 19.)  Although Q.K. has made progress in his "academic, attention/executive, motor, language, and socio-behavioral skills" at Lab, he "continues to perform below age and grade expectations due to the nature and severity of his disabilities."  (Compl. ¶¶ 16, 18; *see also* Pls.' Ex. P-32 (Q.K.'s Lab progress report for the 2019–20 school year).)

### i. *Educational and Behavioral Testing*

The Parents contacted special education consultant Dr. Laura Solomon in the summer of 2019.[4]  Dr. Solomon observed Q.K. for the day on July 10, 2019 as he attended Lab's Extended

---

[4] The parties appear to implicitly disagree about whether the Parents only engaged Dr. Solomon's services and began the MCPS IEP development process when they learned that MCPS could fund some students' attendance at Lab after observing Montgomery County school buses transporting students to and from Lab.  (*Compare* Pls.' Mot. Summ. J. Mem. Supp. at 5 ("To better understand Q.K.'s needs, in July of 2019, the parents hired an educational consultant, Dr. Laura Solomon, to complete an evaluation of Q.K. and to guide their decision-making regarding his educational programming and placement, as well as to provide updated levels of performance."), *with* Defs.' Cross Mot. Summ. J. Mem. Supp. at 3 ("The Parents of the Student learned in the summer of 2019 that MCPS funded certain students' attendance at the Lab School after noticing that Montgomery County school buses were transporting said students to and from school. . . . At the suggestion of other Lab School parents, the Parents engaged an educational consultant, Dr. Laura Solomon, to see if MCPS would also fund Q.K.'s attendance at the Lab School.").)  The ALJ found that the Parents did engage their expert at the advice of other Lab parents "to explore the possibility of MCPS funding the Student's attendance at the Lab School."  (*See* ALJ Decision at 10; *see also* Defs.' Ex. 65 at 000443 (providing an email from Q.K.'s father to Dr. Solomon requesting an initial consultation and explaining that "[a]lthough we met with Montgomery county special education Services, we were unaware that county funding for lab school was possible.") [*sic*].)

School Year ("ESY") summer program. (*See* Compl. ¶¶ 17, 19–21; Pls.' Ex. P-14.) She identified several areas for Q.K. to focus on improving, including "persistence" and "attention." Based on her observations, Dr. Solomon recommended that Q.K. receive "[c]oncrete reinforcement and contingencies, visual schedules, structure, and clear indications of what needs to be accomplished"; "[s]trategy instruction" and work/environment modifications to help address Q.K.'s attention; instruction pacing, "opportunities for repeating information and time for processing"; reduction of Q.K.'s workload; accessible "grade-level content"; occupational therapy; and speech/language therapy. (Pls.' Ex. P-14 at 6–7.)

Dr. Solomon also completed a diagnostic educational evaluation of Q.K. on August 6, 2019, using a series of testing instruments: the Woodcock-Johnson Tests of Achievement-Fourth Edition Form ("WJ-4"); the Peabody Picture Vocabulary Test-Fifth Edition Form B ("PPVT-5"); and the Expressive Vocabulary Test-Third Edition Form B ("EVT-3"). (Pls.' Ex. P-20 at 3–4.) Q.K.'s results varied. He scored in the "Expected" and "Average" ranges in vocabulary (achieving scores in the 84th percentile on the PPVT-5 and in the 50th percentile on the EVT-3). (*Id.* at 4–5.) Q.K. scored in the "Low" range in reading (achieving scores in the 3rd percentile on the WJ-4 Letter-Word Identification Subtest, the 2nd percentile on the WJ-4 Word Attack Subtest, the 5th percentile on the WJ-4 Passage Comprehension Subtest, and the 4th percentile on the Sentence

---

This disputed fact may be relevant to evaluate whether the Parents participated in the MCPS IEP process with an open mind. (*See* Defs.' Cross Mot. Summ. J. Mem. Supp. at 41–42); *see also Sanger v. Montgomery Cnty. Bd. Of Educ.*, 916 F. Supp. 518, 526 (D. Md. 1996) (excusing a delayed IEP, in part, because the student's parents "were wedded to" private school funding and had "made it clear" from the outset that they would accept nothing else). The ALJ did not find and Defendants do not explicitly argue that Plaintiffs acted in bad faith—although Defendants seem to heavily suggest as much. (*See* Defs.' Cross Mot. Summ. J. Mem. Supp. at 41–42.) Because the Court ultimately concludes that the MCPS IEP provided Q.K. with a FAPE based on its review of the evidence relating to Q.K.'s needs, whether the Parents would have accepted anything other than funding for Lab is not especially relevant here. Accordingly, the Court finds that this disputed fact is immaterial and therefore does not bear on the pending Motions for Summary Judgment. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any *material* fact and the movant is entitled to judgment as a matter of law.") (emphasis added).

Reading Fluency Subtest). (*Id.* at 5–6.) He scored within and at the bottom of the "Average" range in math (achieving scores in the 29th percentile on the WJ-4 Calculations Subtest, the 43rd percentile on the WJ-4 Applied Problems Subtest, and the 9th percentile on the WJ-4 Math Facts Fluency Subtest). (*Id.* at 10.) Q.K. scored in the "Average" and in the "Low" ranges in written language and spelling (achieving scores in the 3rd percentile on the WJ-4 Spelling Subtest, the 42nd percentile on the WJ-4 Writing Sample Subtest, and in the 4th percentile on the WJ-4 Sentence Writing Fluency Subtest). (*Id.* at 13–14.) Dr. Solomon concluded that Q.K. meets the criteria for Specific Learning Disabilities in reading, math, spelling, and written expression, (*id.* at 6, 11, 14), and suggested a number of programming and instructional interventions. (*Id.* at 6–9, 11–12, 14–16.) Finally, Dr. Solomon identified anxiety and executive functioning as behavioral areas of concern. (*Id.* at 17.) She ultimately concluded that Q.K. was "appropriately placed" at Lab. (*Id.* at 24.)

In October of 2019, the Parents enlisted the assistance of Dr. Jaclyn Halpern to complete a psychological evaluation of Q.K. (Compl. ¶ 27.) Dr. Halpern assessed Q.K.'s "intellectual, attentional/executive functioning, [ ] social/emotional functioning," and his language skills, and concluded that Q.K. meets the criteria for diagnoses of Attention-Deficit Hyperactivity Disorder, Combined Type ("ADHD") and Mixed Anxiety and Depressive Disorder ("MADD"). (*Id.*; *see* Pls. Ex. P-23.) Dr. Halpern included a number of recommendations in her report, including her opinions that Q.K. "continues to require a full time, self-contained special education setting" and that he "should continue to receive on-site Speech-Language, Occupational Therapy, and Psychological services." (Pls. Ex. P-23 at 20.)

8

### c. *Procedural Background*

#### i. *First IEP Meeting*

In early January of 2020, the Parents contacted MCPS to develop an IEP for Q.K. (Compl. ¶ 29; Pls.' Ex. P-24.) The Parents prepared and submitted to MCPS a referral packet that included, *inter alia*, documentation of the interventions Q.K. received at Lab, a questionnaire filled out by the Parents, and teacher referral and classroom observation forms from Lab. (*See* Defs. Exs. 1– 7.)

On February 5, 2020, an IEP meeting (the "First IEP Meeting") was convened at Takoma Park Middle School ("TPMS") to review Q.K.'s evaluations and assessments "and determine his eligibility for special education services." (ALJ Decision at 21–22; Defs.' Ex. 28.) In attendance were:

- The Parents;
- Dr. Solomon;
- Jocelyn Watson, TPMS special education resource teacher;
- Sarah Stout Powers, MCPS school psychologist;
- Pamela Lever, school counselor;
- Christina Mills, Lab School homeroom teacher (by phone);
- Kim Brown, Lab School division head (by phone); and
- Dr. John Silsby, Lab School psychologist.[5]

(Defs.' Ex. 28; *see also* ALJ Decision at 22.) At the meeting, the IEP team accepted the reports prepared by Drs. Solomon and Halpern to find that Q.K. was eligible for specialized services and concluded that Q.K. "meets the criteria as a student with a specific learning disability." (Defs.' Ex. 29 at 000289.) Although the Parents submitted relevant external data at the meeting, because neither the MCPS speech pathologist nor a representative from the MCPS physical disabilities

---

[5] There appears to be a discrepancy between the ALJ Decision and the February 5 meeting sign-in sheet about whether Dr. Silsby attended in person or by phone. (*Compare* ALJ Decision at 22, *with* Defs.' Ex. 28.) This inconsistency is immaterial to the disposition of the Motions currently pending, and accordingly, the Court need not resolve it.

program was able to attend, the team "could not make a determination for eligibility for speech or occupational therapy." (*Id.* at 000290.) The IEP team agreed to "develop an IEP and hold an IEP development meeting within 30 days."[6] (*Id.* at 000289.)

MCPS provided the Parents and Dr. Solomon with a draft IEP on February 25, 2020. (Compl. ¶ 37; Pls.' Mot. Summ. J. Mem. Supp at 8; Defs.' Cross Mot. Summ. J. Mem. Supp. at 4.) The draft IEP contained a number of findings relating to Q.K.'s present level of academic achievement and functional performance ("PLAAFP"), goals, and services, including access to a small group, frequent breaks, and reduced distractions. (*See generally* Defs.' Ex. 20.) Dr. Solomon suggested a number of edits to the draft IEP. (*See id.*; Pls.' Ex. P-30; *see also* Compl. ¶ 38; Pls.' Mot. Summ. J. Mem. Supp at 8; Defs.' Cross Mot. Summ. J. Mem. Supp. at 4.)

### ii. Second IEP Meeting

Due to scheduling complications arising from Dr. Solomon's illness and the emergence of the COVID-19 pandemic, the IEP team did not meet again until April 27, 2020 (the "Second IEP Meeting"). (*See* ALJ Decision at 24; Compl. ¶¶ 39–40.) The following individuals attending the Second IEP Meeting:

- The Parents;
- Meghan Probert, family counsel;
- Dr. Solomon;
- Jocelyn Watson, TPMS special education resource teacher;
- Sarah Stout Powers, MCPS school psychologist;
- Alicia Deeney, TPMS Principal;
- Megan Litten, counselor;

---

[6] There is a factual dispute as to whether at the February 5, 2020 IEP team meeting, MCPS personnel agreed to refer Q.K.'s case to the Central IEP—where some cases are referred during the IEP development process "when a school team determines that services are not sufficient at the school-based level to meet students' needs." (ALJ Decision at 23. *Compare* Compl. ¶ 32, *and* Pls.' Mot. Summ. J. Mem. Supp. at 7, *and* ALJ Hr'g Tr. at 72:16–76:13, 197:24–198:19, *with* Defs.' Cross Mot. Summ. J. Mem. Supp. at 4, *and* ALJ Hr'g Tr. at 537:3–538:21.) The ALJ concluded that MCPS "did not agree or commit" to referring Q.K.'s case to the Central IEP at the February 5 meeting. (ALJ Decision at 23.) Because the Court finds that the IEP team considered and rejected Q.K.'s placement in a "self-contained setting at the Lab School," (Pls.'s Ex. P-34 at 1), and concludes that the MCPS IEP that was ultimately proposed did not deny Q.K. a FAPE, whether MCPS agreed to refer Q.K.'s case to the Central IEP is immaterial.

- Caroline Chance, general education teacher;
- Rosalind Myers, speech language pathologist;
- Stacy Reid Swain, MCPS counsel;
- Dr. Melissa Brunson, MCPS special education supervisor; and
- Margaret Bourne, notetaker.

(Defs.' Ex. 115.)  After reviewing the draft IEP, the IEP team proposed the following changes to

the IEP, many of which were suggested by Dr. Solomon, (*see, e.g.*, Defs.' Ex. 20 at 000157):

- Q.K. was eligible for services under the specific learning disability code;
- Addition of a PLAAFP for the cognitive category to reflect Dr. Halpern's data;
- Addition from Dr. Halpern's report to the social-emotional needs portion of the IEP;
- Revise wording on the impact statement;
- Add/revise supplementary aids;
- Add agreed accommodations:
  - o  1e: blank scratch paper;
  - o  1f: eliminate answer choice;
  - o  1h: directions read aloud and repeated;
  - o  1o: redirect student;
  - o  Human reader for all areas; and
  - o  100% + extra time;
- Revise phonics goal;
- Revise other goals using language from the Lab IEP;
- Placement at Takoma Park Middle School to access services through the home school model (inclusion[7] core classes and reading intervention; self-contained resource); and
- The possibility of critical staffing to support his needs in the home school.

(Pls.' Exs. P-30, P-34.)

The IEP team refused to add visual and visual-motor accommodations at that point,

because such Q.K.'s needs in these areas could not be determined "until vision assessments [were]

completed and reviewed by the OT/Vision departments."  (Pls.' Ex. P-34.)  The IEP team also

declined to consider placement for Q.K. at in an entirely self-contained[8] setting at Lab, and instead

"agreed that the [ ] proposed revision[s]/additions create[] an IEP that meets [Q.K.'s] needs."  (*Id.*)

The Parents disagreed with both of these refusals and expressed their concern that Q.K. would not

---

[7] The Court understands this "inclusion" setting to mean classes that include both disabled and non-disabled students.
[8] The Court understands a "self-contained" setting to only include students with disabilities.

be successful at TPMS. (*Id.*) They argued that the proposed IEP was inadequate because Q.K. requires small groups and direct support; he deserves access to electives and the MCPS IEP includes a reading intervention class that would displace the elective slot in Q.K.'s schedule; the physical aspects of attending a bigger school might pose difficulties for Q.K., as he is susceptible to infection, quick to tire, and smaller in stature (which may cause him to be bullied); and the proposed IEP failed to fully address the challenges posed by his anxiety and ADHD diagnoses. (*Id.*; *see also* Compl. ¶¶ 43–45.) the IEP team also rejected adding assessment to the eligibility page because this data would be included in the PLAAFP. (Pls.' Ex. P-34.) Finally, the IEP team declined to add an area to the PLAAFP addressing Q.K.'s health needs until further documentation could be provided. (*Id.*) Following the April 27 meeting, MCPS provided a revised draft IEP dated April 30, 2020, and Dr. Solomon again suggested revisions. (*See* Defs.' Exs. 21, 22; Pls.' Ex. P-35; *see also* ALJ Op. at 26.)

### iii. Speech-Language Assessment

Toward the end of May 2020 and in the beginning of June, Bambi M. Lowry—a certified speech language pathologist employed by MCPS—conducted a series of virtual assessments with Q.K. to evaluate his speech-language needs. (ALJ Op. 27.) On June 12, 2020, she issued her findings in a report. (Defs.' Ex. 17.) Ms. Lowry used three assessments to assess Q.K.'s speech and language skills: the Comprehensive Assessment of Spoken Language, Second Edition ("CASL-2); the Oral Passage Understanding Scale ("OPUS"); and the Test of Pragmatic Language, Second Edition ("TOPL-2"). (*Id.* at 000120.) Q.K. scored within age expectancy on all three of these tests, with the exception of the Double Meaning CASL-2 subtest, in which Q.K. scored below age expectancy. (*Id.* at 000121–000123.) However, Q.K.'s scores were at age expectancy for the other six CASL-2 subtests. (*Id.*) In addition to non-standardized speech-

language testing and data submitted by Q.K.'s mother, Ms. Lowry found that Q.K. had no

significant needs with his narrative or his conversational language skills after reviewing two

language samples. (*Id.* at 000129–000130.) Based on Q.K.'s speech sample, Ms. Lowry made

the following findings:

- Voice: Appropriate, in terms of pitch, quality, and loudness, for age, size, and gender;
- Fluency: No dysfluencies noted; speech fluency skills within expectations; and
- Articulation: No obvious speech sound substitutions noted; speech intelligibility rated at or near 100% in known and unknown contexts.

(*Id.* at 000130.) Ms. Lowry concluded that Q.K.'s "overall speech-language skills are at or

approaching age expectancy range[,]" and that accordingly, the "speech and language data [did]

not support the presence of oral communication needs that would require speech-language

support."[9] (*Id.* at 000131.)

### iv. Third IEP Meeting

The third and final IEP team meeting occurred on July 9, 2020 to determine whether Q.K.'s

IEP should include speech-language services (the "Third IEP Meeting"). (*See* Pls.' Ex. P-40.) The

following individuals attending the Third IEP Meeting:

- The Parents;
- Meghan Probert, family counsel;
- Dr. Solomon;
- Jocelyn Watson, TPMS special education resource teacher;
- Pam Lever, general education teacher;
- Sarah Stout Powers, MCPS school psychologist;
- Bambi Lowry, speech-language pathologist;
- Stacy Reid Swain, MCPS counsel; and
- Dr. Melissa Brunson, MCPS special education supervisor.

(Defs.' Ex. 116.) The IEP team reviewed the data provided in Ms. Lowry's report and concluded

that speech-language services were not recommended, explaining that the "data showed that [Q.K.]

---

[9] Ms. Lowry was unable to observe Q.K. in a classroom setting due to COVID-related school closures. (Defs.' Ex. 17 at 000130–000131.)

has the linguistic skills to perform at grade level but may not have the behavioral skills to interact socially." (Pls.' Ex. P-40.) The Parents disagreed, arguing that the results outlined in Ms. Lowry's report "[did] not match actual performance in a classroom or what they [had] seen at home during distance learning," questioning "the range of findings that was gathered from [the] questionnaire as reported," and noting that they "would like to see standard scores where raw scores and descriptors were reported on the CAS-L." (*Id.*) Ms. Lowry explained that her findings were reported as such "due to the constraints of not being able to conduct fact to face assessments." (*Id.*)

### v. Final IEP

Q.K.'s IEP was finalized on July 9, 2020 (the "Final IEP").[10] It specified that Q.K. "is eligible as a student with a disability for special education and related services," and listed his primary disability as "SPECIFIC LEARNING DISABILITY, Other: reading, writing, and math." (Pls.' Ex. P-39 at 2.) It identified the following areas that are impacted by Q.K.'s disability: "Academics (reading, comprehension, fluency, vocabulary), written expression and mechanics, math calculation and problem solving, attention, [and] social-emotional." (*Id.*) As established in previous IEP team meetings, the IEP accepted the findings contained in Drs. Solomon's and Halpern's reports. (*Id.*) The Final IEP also contains a section describing Q.K.'s PLAAFP, which incorporates Drs. Solomon's and Halpern's detailed findings as well as Q.K.'s Lab reports and addresses the following areas: reading phonics; reading fluency; reading comprehension; math calculation; math problem solving; written language mechanics; written language expression; cognitive; social emotional/behavioral; and self-management. (*Id.* at 6–13.)

---

[10] Although the document itself is dated April 30, 2020, the Parties agree that MCPS IEP was finalized on July 9, 2020. (*See* Ltr. from Pls.' Counsel Listing Exs. (characterizing Ex. P-39 as "MCPS Final IEP, 7-9-20 (dated 4-30-20)"); Defs.' Cross Mot. Summ. J. Mem. Supp. at 7.)

The Final IEP also identifies the special modifications and services to which Q.K. will have access under its terms. It states that Q.K. "should have access to a word processor, speech to text and electronic spell check for writing; electronic text reader, text to speech for reading[;] and calculator for math." (*Id.* at 15.) The Final IEP contains the following aids, services, program modifications and supports:

- Provide structured time for organization of materials;
- Multi-sensory supports, cues, and instruction;
- Check agenda book for completeness and accuracy;
- Repetition of directions;
- Provide alternative ways for students to demonstrate learning;
- Paraphrase questions and instruction;
- Monitor independent work;
- Limit amount to be copied from board;
- Have student repeat and/or paraphrase information;
- Frequent and/or immediate feedback;
- Allow use of organizational aids;
- Allow use of manipulatives;
- Provide assistance with organization;
- Check for understanding;
- Front load and review math terms and vocabulary;
- Provide formula sheet;
- Break down math word problems into steps;
- Provide graph or lined paper for math computation;
- Provide proofreading checklist;
- Allow use of highlighters during instruction and assignments;
- Color coded writing;
- Study guides with main ideas and points for given unit;
- Verbal rehearsal prior to writing;
- Simplified sentence structure, vocabulary, and graphics on assignments and assessments;
- Separate long paragraph questions into bullets, whenever possible;
- Revise format of test (i.e., fewer questions, fill in the blank);
- Reduced length of exams;
- Reduce number of answer choices;
- Delete extraneous information on assignments and assessment, when possible;
- Chunking of text(s);
- Allow for dictation;
- Extra time for processing information and formulating responses;
- Advance notice of tests and quizzes;
- Break down assignments into smaller units;

- Reinforce positive behavior through non-verbal/verbal communication;
- Strategies to initiate and sustain attention;
- Provide manipulatives and/or sensory activities to promote listening and focusing skills;
- Provide frequent changes in activities or opportunities for movement;
- Advance preparation for schedule changes; and
- Preferential seating.

(Pls.' Ex. 39 at 19–30; Defs.' Ex. 23 at 000248–000259.) A special education classroom teacher is listed as the primary provider of these services, with some services also facilitated by a general education teacher and/or an instructional assistant. (*Id.*) The Final IEP also contains a number of specific goals for Q.K.'s academic and social/behavioral/emotional development. (Pls.' Ex. P-39 at 34–42.)

The Final IEP summed up the services to be provided to Q.K. at TPMS:

- Q.K. will receive instruction in an inclusion setting for all core academic subjects (math, science, world studies and English) as well as reading intervention. These classes meet for ninety minutes every other day with the exception of math, which meets daily (total of 22 hours and 30 minutes per week);
- Q.K. will be instructed in a self-contained special education setting of the resource class period. This class meets every other day for ninety minutes (total of 3 hours and 45 minutes per week); and
- Q.K. will receive weekly counseling services for thirty minutes—to be provided by the school counselor—to address his social-emotional needs.[11]

(Defs.' Ex. 23 at 000272–000273.) The primary service provider for both Q.K.'s inclusion instruction and his self-contained instruction is listed as the special education classroom teacher, with the general education teacher and instructional assistant listed as "other" providers. (*Id.* at 000272.) The IEP explains that the course of its development, the "team considered 100% general education and inclusion setting provided through the home school model with self-contained resource" in addition to "100% self-contained at the current parent placed private school setting."

---

[11] The Plaintiffs and the Defendants each submitted a copy of the Final IEP in the Administrative Record. (*Compare* Pls.' Ex. P-39, *with* Defs.' Ex. 23.) The IEP submitted by the Plaintiffs does not include a description of the counseling services described above. (Pls.' Ex. P-39 at 43–44.) Because Plaintiffs do not dispute that MCPS has offered to provide these services, the Court concludes that the blank page in Plaintiffs' exhibit was an inadvertent omission.

(*Id.* at 000274.) Q.K. was not placed in a purely general education environment because he "requires direct support and specialized services to address his needs with executive functioning skills as well as social-emotional needs" that "cannot be provided directly in the general education" setting. (*Id.*)

### vi. Due Process Hearing and District Court Complaint

The Parents filed a Request for a Due Process Hearing on May 21, 2020, challenging the MCPS IEP. (Compl. ¶ 48.) They later amended their request to address MCPS's decision that Q.K. was ineligible for speech/language services. (Compl. ¶ 55.) In their Request, the Parents sought placement for Q.K. at Lab for the 2020–21 school year and reimbursement for the costs they incurred during the 2019–20 school year, including tuition and related services. (Pls. Ex. 1 at 7.) Thereafter, ALJ Levin presided over a five-day hearing held in October 2020 via the Google Meet platform, during which Plaintiffs presented seven witnesses and Defendants presented five. (*See* ALJ Decision at 4; *see generally* ALJ Hr'g Tr.)

In a November 18, 2020, decision (OAH No. MSDE-MONT-OT-20-11841), the ALJ concluded that the Final IEP "offer[ed] a FAPE in the least restrictive environment—the general education inclusion setting at TPMS, [Q.K.'s] home school—and that this placement is appropriate." (ALJ Decision at 69.) The "focus" of the dispute, the ALJ determined, was whether the "proposed *placement* in the TPMS inclusion program is reasonably calculated to enable [Q.K.] to make appropriate progress in meeting" his needs and goals as outlined in the Final IEP. (*Id.* at 70 (emphasis in original).) The ALJ found that the Plaintiffs' central argument created a "false choice" between Q.K.'s placement in a large class at TPMS or a small class at Lab, which ignored the flexibility offered by the IEP inclusion program. (*Id.*) Rather, he concluded that the IEP inclusion program, which offered "extensive special education services, supplementary aids and

support in a general education setting" and therefore allowed "the general education students in the inclusion classroom [to] model behavior [for students] with special education needs[,]" the proposed placement was appropriate and satisfied the LRE requirement. (*Id.* at 73.) The ALJ therefore denied "the Parents' request for placement at and reimbursement for tuition, costs and expenses" at Lab. (*Id.* at 86.)

The Parents filed a timely complaint in this Court seeking review of the ALJ Decision and arguing that (1) Defendants' failure to provide Q.K. with a FAPE violated the IDEA and Maryland law; (2) Defendants' failure to provide Q.K. with an appropriate educational placement violated the IDEA and Maryland law; and (3) "[t]he ALJ committed error[] and violated [P]laintiffs' due process rights under the IDEA and Maryland law[.]" (*See* Compl. (filed February 3, 2021); *see also* 20 U.S.C. § 1415(i)(2)(B); Md. Code. Ann., Educ. § 8-413(j). Both parties have moved for summary judgment. (Pls.' Mot. Summ. J. Mem. Supp.; Defs.' Cross Mot. Summ. J. Mem. Supp.) The Court now turns to these Motions.

## II. *Legal Standard*

### a. *Summary Judgment*

A party can move for summary judgment on a "claim or defense—or the part of [any] claim or defense," provided it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If the moving party carries this burden, then the Court will award summary judgment, unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"

18

then a genuine dispute of material fact is presented and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

### b. The Individuals with Disabilities Education Act

In reviewing the decision of the ALJ in an IDEA case, a district court must apply "a 'modified de novo review, giving due weight to the underlying administrative proceedings.'" *M.L. ex rel. Leiman v. Smith*, 867 F.3d 487, 493 (4th Cir. 2017) (citing *O.S. v. Fairfax Cnty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015)); *see also Rowley*, 458 U.S. at 206. A district court looks to whether the ALJ's findings of fact were "regularly made" when determining the degree of deference to afford the ALJ's findings. *S.S. v. Bd. of Educ. Of Hartford Cnty.*, 498 F. Supp. 3d 761, 775 (D. Md. 2020) (citing *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)). To determine whether an ALJ's findings were "regularly made," a district court "should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." *Doyle*, 953 F.2d at 105. Findings of fact are not "regularly made" and are therefore "entitled to no weight" if "an administrative officer departs 'so far from the accepted norm of a fact-finding process designed to discover truth.'" *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 485 (4th Cir. 2011) (quoting *Doyle*, 953 F.2d at 104–05).

Findings of fact that are regularly made "are entitled to [a] *prima facie* [presumption of] correctness." *S.S.*, 498 F. Supp. at 776. This means that if a district court does not follow the ALJ's findings, it must explain why. *Id.* (citing *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 531 (4th Cir. 2002). Even if the district court determines that an ALJ's regularly

made findings of fact are entitled to deference, however, the district court must make "an independent decision based on its view of the preponderance of the evidence," make findings of fact, and decide "whether the state has complied with the IDEA." *Sumter Cnty.*, 642 F.3d at 484; *see also* 20 U.S.C. § 1415(i)(2)(C)(iii).

"[T]he party challenging the administrative findings . . . bear[s] the burden of proof of establishing an IDEA violation." *M.C.E. ex rel. T.Q.A v. Bd. of Educ. of Frederick Cnty.*, Civ. No. RDB-09-3365, 2011 WL 2709196, at *7 (citing *Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991)); *cf. Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir. 2004) (holding that "parents who challenge an IEP have the burden of proof" in IDEA administrative hearings).

### III.   Discussion

"Whether a [school district] has violated the IDEA has procedural and substantive components." *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 245 (4th Cir. 2019). Although Plaintiffs make a passing suggestion in their briefing that they are entitled to relief "for reasons both procedural and substantive," Defendants correctly observe none of Plaintiffs' arguments allege a procedural violation of the IDEA.[12] (Pls.' Opp'n Defs.' Cross Mot. Summ. J. at 1; *see also* Defs.' Cross Mot. Summ. J. Mem. Supp. at 23.)  Accordingly, the Court first determines the degree of deference to which the ALJ's findings of fact and MCPS's judgments of educational policy are entitled before turning to Defendants' substantive compliance with the IDEA.

---

[12] The IDEA includes many procedural safeguards, including those that ensure a parent's right to "examine all records" relating to their child, to "participate in meetings" regarding the development of an IEP, and to an independent educational evaluation, 20 U.S.C. § 1415(b)(1); instruct local education agencies to issue a detailed "[w]ritten prior notice" when the agency proposes a change or refuses to change the IEP, 20 U.S.C. §§ 1415(b)(3), 1415(c)(1); and direct local education agencies to ensure that the parties have access to mediation to resolve disputes, should they so choose. § 1415(e).  Plaintiffs' arguments do not address these kinds of requirements and instead challenge the ALJ's decision making and the substantive validity of the Final IEP under the IDEA.

### a. *Deference*

In an IDEA case, the "underlying administrative proceedings" are entitled to "due weight." *M.L. ex rel. Leiman v. Starr*, 121 F. Supp. 3d 466, 474 (D. Md. 2015). A reviewing court must also avoid "substitut[ing] their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

#### i. *Deference to the ALJ's Findings of Fact and Credibility Determinations*

As an initial matter, the Court concludes that the ALJ's factual findings were regularly made and are therefore entitled to "due weight." As explained, "factual findings are only considered not 'regularly made' if they are 'reached through a *process* that is far from the accepted norm of a fact-finding process.'" *S.S.*, 498 F. Supp. 3d at 777 (citing *Cnty. Sch. Bd. of Henrico Cnty. v. Z.P.*, 399 F.3d 298, 305 (4th Cir. 2005)) (emphasis added in *Hartford Cnty.*). Based on the Court's review of the record, *see* 20 U.S.C. § 1415(i)(2)(C)(i), "there is nothing . . . suggesting that the [ALJ's] process in resolving the case was anything other than ordinary." *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254, 259 (4th Cir. 2008). The ALJ held a five-day hearing on this matter, during which both the Plaintiffs and MCPS made opening statements and closing arguments. (*See* ALJ Hr'g Tr. Day 1 9:21–20:4, Day 5 5:13–132:7.) The parties were allowed present witnesses and to cross examine each other's witnesses. (*See, e.g.*, ALJ Hr'g Tr. Day 4 893:2–903:22 (allowing direct, cross, re-direct, and re-cross examination of J.K., Q.K.'s father.)) The ALJ issued an 86-page opinion (excluding mailing certification and exhibit lists) meticulously detailing his findings of fact, (ALJ Decision at 7–40), as well as the reasons for his conclusions of law. (*Id.* at 68–86.) The ALJ "by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *J.P.*, 516 F.3d at 259.

21

Plaintiffs argue that the ALJ's factual findings are not entitled to deference because "the ALJ consistently erred in his analysis, scope of evidentiary consideration, and ultimate denial of relief[.]" (Pls.' Mot. Summ. J. Mem. Supp. at 15.) However, the primary case on which Plaintiffs rely, *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189 (9th Cir. 2017), is inapposite. The Ninth Circuit appears to apply a different standard than the Fourth Circuit in determining the degree of deference to afford an ALJ's findings. The Ninth Circuit gives deference to these findings when they are "thorough and careful," *id.* at 1194, whereas district courts in the Fourth Circuit must afford deference to the ALJ's findings if the ALJ's *process* did not depart "far from the accepted norm[.]" *S.S.*, 498 F. Supp. 3d at 777. Moreover, *Antelope Valley* has already been distinguished by this very Court. *See R.S. v. Smith*, Civ. No. PX-20-1300, 2021 WL 3633961, at *9 (D. Md. Aug. 17, 2021).

Here, as with *R.S.*, "[t]he ALJ considered all documentary evidence" and "carefully scrutinized" witness testimony. *Id.* The ALJ largely structured his analysis to address each of Plaintiffs' objections to the Final IEP. (*See* ALJ Decision at 68–85.) For example, in addressing Plaintiffs' concern that the Final IEP did not include speech-language services, the ALJ explained the Parents' arguments in favor of the inclusion of such services; described the relevant testimony from experts Melissa Wood, Dr. Solomon, and Dr. Silsby; explained the arguments asserted by MCPS; and clearly explained his reasons for following the findings of the MCPS speech pathologist rather than Plaintiffs' evidence. (*Id.* at 78–79.) "[T]he level of detail required of a hearing officer is relatively low," and the ALJ's thorough analysis exceeded the standard that the ALJ Decision was legally required to meet. *J.P.*, 516 F.3d at 262.

In a similar vein, Plaintiffs argue that the ALJ "ma[de] no credibility determinations regarding the testimony of the parents' witnesses" and that he erred in relying on the testimony of

school officials, who they argue lacked knowledge about Q.K. (Pls.' Mot. Summ. J. Mem. Supp. at 25.) This argument is unavailing. The ALJ need not have "offer[ed] a detailed explanation of his . . . credibility assessments," and "the Fourth Circuit has consistently held that an ALJ's implicit credibility determinations are entitled to the same deference as explicit findings." *S.A. v. Weast*, 898 F. Supp. 2d 869, 877 (D. Md. 2012) (citing *J.P.*, 516 F.3d at 261; *Z.P.*, 399 F.3d at 305).[13] The ALJ exceeded what was required of him in this regard. He thoroughly detailed the testimony of all witnesses, (*see* ALJ Decision at 49–67), and explained why he was persuaded by some of the witnesses' testimony and not others. (*Id.* at 68–86.) It therefore appears to the Court that the ALJ found all witnesses to be credible (explicitly in some cases and implicitly in others) in that the witnesses all believed the truth of their testimony. Thus, the ALJ appropriately focused the analysis on which witnesses he found to be more *persuasive*. *See J.P.*, 516 F.3d at 260–61 (finding it proper for an ALJ to accept all witnesses as credible and still find one party's evidence more persuasive than the other's).

Plaintiffs' remaining arguments in this regard are best characterized as challenges to the ALJ's underlying conclusion that the Final IEP did not deny Q.K. access to a FAPE because they challenge how the ALJ weighed the evidence, rather than the methods he used. (*See* Pls.' Mot. Summ. J. Mem. Supp. at 15–40.) As in *S.S.*, Plaintiffs' remaining "complaints regarding the fact finding of the ALJ do not relate to the process used by the ALJ but instead to his interpretation and characterization of the data." *S.S.*, 498 F. Supp. 3d at 777. This simply is not the inquiry the Court

---

[13] Plaintiffs argue that *S.A.*, as well as seemingly any case that preceded *Endrew F.*, is "outdated" and "mostly super[s]eded." (Pls.' Opp'n Defs.' Cross Mot. Summ J. at 2–3). Although *Endrew F.* clarified—and perhaps even heightened—the substantive standard of a FAPE, it did not abrogate *Rowley*'s instructions to afford deference to ALJs and educators. Indeed, it expressly reaffirmed that the conclusions educators are entitled to deference. *See Endrew F.*, 137 S. Ct. at 1001 ("This absence of a bright-line rule, however, should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'") (quoting *Rowley*, 458 U.S. at 206). The Fourth Circuit has similarly reaffirmed the "due weight" afforded to ALJs' factual findings after *Endrew F. See, e.g., Cecil Cnty.*, 919 F.3d at 244.

is tasked with in making the threshold deference determination. Because "[m]ere disagreement with the ALJ's determinations does not render the facts 'irregularly made,'" *R.S.*, 2021 WL 3633961, at *9, the Court considers the ALJ's findings to be "regularly made" and, accordingly, affords those findings "due weight." *See Rowley*, 458 U.S. at 206.

### ii. Deference to MCPS Officials

The preponderance of the evidence standard under which courts must evaluate IEPs "is by no means an invitation . . . to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206; *see also Endrew F.*, 137 S. Ct. at 1001. "Courts conduct this analysis with an understanding that 'crafting an appropriate program of education requires a prospective judgment by school officials.'" *Cecil Cnty.*, 919 F.3d at 250 (citing *Endrew F.*, 137 S. Ct. at 999). After reviewing the record, the Court finds that MCPS has offered "a cogent and responsive explanation for their decisions," *Endrew F.*, 137 S. Ct. at 1001, and agrees with the ALJ's conclusion that "MCPS has the experience, resources, personnel and capability in the inclusion setting at TPMS of educating students with needs similar to or greater than [Q.K.'s]." (ALJ Decision at 70.) Although MCPS was not familiar with Q.K. himself, the Court concludes that in developing Q.K.'s IEP, MCPS brought to bear its familiarity with accommodating students with similar needs as Q.K. (*See, e.g.*, ALJ Hr'g Tr. Day 3 at 565:23–566:5 (testimony of Jocelyn Watson, TPMS special education resource teacher, explaining that TPMS places in its "inclusion" classrooms students "who kind of meet the same profile" as Q.K. as well as students who are "probably even more significantly delayed in terms . . . of their academic profiles.").)

Plaintiffs fault the MCPS witnesses for lacking knowledge of and personal experience with Q.K., which they argue was exacerbated by the fact that apart from a speech evaluation, MCPS

did not conduct its own assessment of Q.K.'s needs. (*See* Pls.' Mot. Summ. J. Mem. Supp. at 20–28.) Such is the situation facing any IEP team when beginning the IEP development process for a student who has not been enrolled in the public school system since preschool: the student is unknown to the local school authority, and the public school programming is unknown to the student and the parents. It would be unfair to fault Defendants for their lack of knowledge, for MCPS cannot be held responsible for the Parents' unilateral decision to enroll Q.K. in private schools, a decision to which the Parents are, of course, perfectly entitled.[14] *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 (2009). The Court therefore declines to adopt Plaintiffs' argument, which, taken to its logical conclusion, would mean that school officials could never receive deference when developing an IEP for a student with whom they have no prior experience.

Even in spite of MCPS's unfamiliarity with Q.K., it was reasonable to rely on the ample evidence Plaintiffs submitted describing Q.K.'s educational needs. It is true that the IDEA places upon state and local educational agencies an affirmative obligation to "conduct a full and individual initial evaluation" of a student requesting an IEP. 20 U.S.C. § 1414(a)(1)(A); *see also Z.B.*, 888 F.3d at 524. Such an assessment must consist of procedures "to determine whether a child is a child with a disability" within the meaning of the IDEA and "to determine the educational needs of such child." §§ 1414(a)(1)(C)(i)(I)–(II). However, "[w]hen 'existing . . . evaluations and

---

[14] The Court observes that while parents should not be faulted for choosing to enroll their children in private school, *i.e.*, that they should not be prevented from seeking reimbursement, *Forest Grove*, 557 U.S. at 243, doing so may make it more difficult to carry the burden of proof at a subsequent due process hearing. Without evidence of a student's failure to progress under the IEP—or an analogous program—it may simply be more difficult for parents to show that the school district did not offer "an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Andrew F.*, 137 S. Ct. at 999. Thus, in explaining that he was not persuaded by the testimony of the Parents' experts in part because they had never observed Q.K. "in a flexible inclusion setting like the one proposed by MCPS," (ALJ Decision at 71), the ALJ did not "penalize[e]" the Parents for enrolling Q.K. in private school. (Pls.' Mot. Summ. J. Mem. Supp. at 25–26.) Nor did he establish an "impossible standard." (*Id.*) Rather, he simply concluded that "[t]here is no historical evidence of [Q.K.'s] performance in a public or private elementary or middle school inclusion setting" that supports Plaintiffs' argument that Q.K. would not make appropriate progress under the Final IEP. (ALJ Decision at 71.) This conclusion is especially appropriate in light of the Parents' burden of proof at the Hearing. *See Schaffer*, 377 F.3d at 456.

information provided by the parents' and 'observations by teachers' and other professionals provide the IEP Team with a reasonable picture of the student's skills and needs, the school may finalize an IEP without any further testing unless requested by the child's parents." *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018) (citing 20 U.S.C. §§ 1414(c)(1)(A)–(B), 1414(c)(4)).

At the First IEP Meeting, the IEP team accepted the reports prepared by Drs. Solomon and Halpern and, based on the description of Q.K.'s educational and behavioral needs therein, concluded that Q.K. was eligible for specialized services. (Defs.' Ex. 29 at 000289.) When the Parents requested that the IEP include speech/language services and occupational therapy, MCPS arranged for Q.K. to be evaluated by Ms. Lowry—a certified speech pathologist in their employ— and requested further evaluation from a developmental optometrist. Consistent with the procedures outlined in the IDEA, MCPS relied on existing evaluations provided by the Parents to conclude that Q.K. has a disability and to determine his "educational needs," and was only required to conduct additional testing upon the Parents' request. *See* 20 U.S.C. § 1414(c)(4)(B). Thus, MCPS complied with its statutory obligations under the IDEA when it relied on the expert reports submitted by the Parents rather than their own observations of Q.K., and the Court will not "substitute [its] own notions of sound educational policy" for those of MCPS. *Rowley*, 458 U.S. at 206; *see also Endrew F.*, 137 S. Ct. at 1001.

### b. *Scope of the IEP*

Next, Plaintiffs argue that the ALJ erred in considering evidence presented by MCPS at the hearing that they aver went "beyond" the promised plan in the Final IEP.[15] (*See* Pls.' Mot.

---

[15] Defendants argue that because Plaintiffs did not raise this argument at the administrative hearing, they "should be precluded from making this argument on appeal." (Defs.' Cross Mot. Summ. J. Mem. Supp at 30.) There is some dispute about whether Plaintiffs in fact raised this argument contemporaneously at the hearing. (*Compare id., with*

Summ. J. Mem. Supp. at 15–20.)  In support of their argument, Plaintiffs cite *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672 (4th Cir. 2007).  *A.K.* held that a particular IEP, as a matter of law, "was not reasonably calculated to enable [an eligible student] to receive benefits" because "it failed to identify a particular school" at which the plan would be executed.[16]  *Id.* at 681.  In doing so, the *A.K.* court recognized that "[i]n evaluating whether a school district offered a FAPE, a court generally must limit its consideration to the terms of the IEP itself."  *Id.* at 682.  This is because

> [e]xpanding the scope of a district's offer to include a comment made during the IEP development process would undermine the important policies served by the requirement of a formal written offer, namely, "creating a clear record of the educational placement and other services offered to the parents" and "assist[ing] parents in presenting complaints with respect to any matter relating to the educational placement of the child."

*Id.* (citing *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001).

Here, the Court finds that the ALJ's analysis did not exceed the scope of the Final IEP in evaluating its legal sufficiency.  The testimony to which Plaintiffs object is best characterized as fleshing out existing services promised in the Final IEP, rather than introducing wholly new ideas not contemplated therein.  *See A.H. v. Smith*, 367 F. Supp. 3d 387, 415 (D. Md. 2019) ("[T]his Court's review of the ALJ's decision reveals that she relied only on the terms of the IEPs themselves and testimony that explained how the IEPs would be implemented at the proposed placements.  Consideration of this testimony was not improper.").  For example, Plaintiffs argue that the Final IEP did not describe the "flexible inclusion setting" that was described at the hearing and that the ALJ considered in his analysis. (Pls.' Mot. Summ. J. Mem. Supp. at 17.)  However,

---

Pls.' Opp'n Defs.' Cross Mot. Summ. J. at 7.) Because the Court concludes that the underlying argument is meritless, it need not decide this point.

[16] The Fourth Circuit expressly declined to hold "that a school district *could never* offer a FAPE without identifying a particular location at which the special education services are expected to be provided." *A.B.*, 354 F.3d at 319 (emphasis added).

as Defendants demonstrate, a number of provisions enumerated in the Final IEP contemplate a degree of "flexibility" in Q.K.'s education plan. (Defs.' Cross. Mot. Summ. J. Mem. Supp. at 33.) For instance, the Final IEP, if implemented, would have provided Q.K. with paraphrasing of questions and instructions; repetition of directions; monitoring of independent work; having Q.K. repeat or paraphrase information; checking for understanding; and strategies to initiate and sustain attention. (Defs.' Ex. 23 at 000249–000251, 000258.)  Each of these services contemplates a significant degree of individualized attention. Additionally, the Final IEP lists a special education classroom teacher as the primary provider of these services, with some services also facilitated by a general education teacher and/or an instructional assistant. (Defs.' Ex. 23 at 000248–000259.) Notably, the special education classroom teacher is also listed as the "primary provider" for both Q.K.'s inclusion setting and self-contained classes—suggesting that Q.K. would receive individualized attention in all of his classes, including those that also include non-disabled students.[17]  (*Id.* at 000272.) Finally, the Final IEP incorporates "small group, explicit instruction" in the plan to accomplish one of Q.K.'s goals in reading comprehension. (*Id.* at 000264.) Unlike the IEPs challenged in the cases cited by Plaintiffs,[18] the terms of the Final IEP support the ALJ's understanding of the offered "flexible inclusion setting" and provide a sufficiently "'clear record of the educational placement and other services offered to the [P]arents.'" *A.K.*, 484 F.3d at 682 (citing *Knable*, 238 F.3d at 768).

---

[17] Plaintiffs fault the ALJ for citing this very page in reaching the conclusion that the Final IEP contemplates a "flexible" inclusion model. (Pls.' Mot. Summ. J. Mem. Supp. at 18.)  As explained, such a model can be inferred as the natural result of the combination of the above-described details that are explicitly included in the Final IEP.

[18] Those IEPs did not identify a particular school at which the promised services would be executed, *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672 (4th Cir. 2007); failed to include an initial evaluation of the student's needs as required by the IDEA, *Z.B. v. District of Columbia*, 888 F.3d 515 (D.C. Cir. 2018); did not include specific services described in witness testimony that were subsequently relied upon by the ALJ, *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57 (D.D.C. 2010); and failed to include "the details of how [the school district] would provide the services, including start and end dates, frequency, and goals"—the last of which is a procedural requirement of the IDEA. *Alfono v. District of Columbia*, 422 F. Supp. 2d 1 (D.D.C. 2006).

Consideration of testimony explaining the Final IEP's express provisions was entirely appropriate,[19] *see A.H.*, 367 F. Supp. 3d at 415, and in fact, was required of the ALJ—who was charged under the IDEA with the task of evaluating whether the Final IEP was "reasonably calculated to enable [Q.K.] to make progress appropriate in light of [Q.K.'s] circumstances." *Endrew F.*, 137 S. Ct. at 999; see also 20 U.S.C. § 1415(f)(3)(E)(i). Accordingly, the Court finds that the ALJ's analysis did not stray beyond the scope of the Final IEP's terms.

### c. The Final IEP Offered a FAPE

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. Based on its *de novo* review of the record, the Court concludes that the ALJ's findings of fact are supported by the evidence and agrees that MCPS has met its substantive obligation to provide Q.K. access to a FAPE. As the ALJ observed, the Final IEP's description of Q.K.'s educational and behavioral needs, as well as his goals, matched those contained in his Lab IEP. (ALJ Decision at 69; *see also* Defs.' Exs. 19, 23.) The Final IEP is appropriately responsive to these needs: it provides dozens of services specifically tailored to address them. *See supra* pp. 14–15; (*see also* Pls.' Ex. 39 at 19–30; Defs.' Ex. 23 at 000248–000259.) For example, it provides "[s]trategies [to] initiate and sustain attention" and use of "manipulatives and/or sensory activities to promote listening and focusing skills." *Id.* at 15. As already discussed, the IEP also provides a special education classroom teacher for both Q.K.'s inclusion setting and self-contained classes to help facilitate these services. (Defs.' Ex. 23 at

---

[19] Plaintiffs also argue that it was improper for the ALJ to make findings about a number of other details not explicitly included in the IEP, including "information about the resource class, the profile of other students in the inclusion model at Takoma Park, the qualifications of the paraeducators, and the available extracurriculars and clubs." (Pls.' Mot. Summ. J. Mem. Supp. at 19.) These descriptions of the Final IEP's practical application—i.e., the day-to-day reality of how the terms of the Final IEP would be executed at TPMS—are similarly tied to the Final IEP's express terms. (*See, e.g.*, Defs.' Ex. 23 at 000272 (describing a special education classroom teacher, a general education teacher, and an instructional assistant as among Q.K.'s service providers)).

000272.) For these reasons—as well as others discussed at greater length *infra* and in the ALJ Decision—the Court concludes that the Final IEP is "reasonably calculated to enable [Q.K.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999.

In challenging the substantive validity of the Final IEP, Plaintiffs argue that that neither the ALJ nor MCPS considered the complexity of Q.K.'s needs, (Pls.' Mot. Summ. J. Mem. Supp. at 28–35), and the ALJ failed to address evidence of Q.K.'s progress at his current and previous educational placements. (*Id.* at 35–40.)

### i. *Complexity of Q.K.'s Needs*

Plaintiffs argue that the ALJ failed to recognize and that the Final IEP failed to account for the complexity of Q.K.'s educational and behavioral needs. Plaintiffs first suggest that it was illogical for MCPS to accept their description of Q.K.'s needs and then reject their recommendation "for an intensive special education program"—which the Court understands refers to the self-contained environment at Lab. (Pls.' Mot. Summ. J. Mem. Supp. at 34.) The Court disagrees. That Plaintiffs and MCPS agreed about the nature and the scope of the challenges facing Q.K. does not mean that the strategies Lab employed to address them were necessary to enable Q.K. to make appropriate progress. Rather, the inclusion setting at TPMS described in the Final IEP is responsive to MCPS's obligations under the IDEA's LRE requirement (discussed *infra* at greater length).

Plaintiffs also reference a few specific services that were excluded from the Final IEP: speech-language services, occupational therapy, psychotherapy, and Orton-Gillingham reading instruction. (Pls.' Mot. Summ. J. Mem. Supp. at 35.) The Court agrees with the ALJ's reasoning supporting his conclusion that none of these services, as described by Plaintiffs, were necessary to offer a FAPE. First, that Lab incorporated speech-language services in its reading class curriculum

does not outweigh Ms. Lowry's findings that Q.K. did not require individual speech-language services. (ALJ Decision at 78.) In her testimony, Ms. Lowry explained that "speech-language pathologists treat spoken language disorders," while "social language difficulty"—one of the challenges the Parents observed in Q.K.—"is the domain of counselors and educators." (*Id.* at 79.) Second, although the Parents submitted a Lab vision screening report in support of their request that the Final IEP include occupational therapy, the report stated and MCPS agreed that further testing from a developmental optometrist was required to determine the extent of Q.K.'s needs in this area. (*Id.* at 81.) At the time of the Hearing, Q.K. had "not yet seen a developmental optometrist." (*Id.*)

Third, the ALJ concluded that the counseling services provided in the Final IEP were calculated to address the same psychological needs as the therapy Q.K. received at Lab from Dr. Silsby: "attention, anxiety, and social relationships." (*Id.* at 80.) Last, the ALJ found that the Parents had not shown that use of the Orton-Gillingham reading instruction was *required* to enable Q.K. to make appropriate progress, and that the Final IEP's inclusion of "a reading intervention class taught by a reading specialist, who could use Orton-Gillingham and/or different methodologies, [was] reasonable and appropriate." (*Id.* at 83.) The Court agrees with the ALJ's conclusion that the Plaintiffs failed to carry their burden at the Hearing to show that MCPS's failure to include any of the services described above denied Q.K. access to a FAPE.

Finally, Plaintiffs challenge the Final IEP's lack of health plan. (Pls.' Mot. Summ. J. Mem. Supp. at 11, 42–43.) Plaintiffs contend that MCPS never sought information about the unique health issues Q.K. suffers as a result of his SDS, pointing to testimony from Q.K.'s mother that no one from MCPS asked her anything about SDS that she did not respond to. (ALJ Hr'g Tr. Day 2 at 276:7–277:9.) Defendants dispute this point, explaining that "the Parents never provided MCPS

31

with medical documentation sufficient to determine how SDS would impact [Q.K.] in the school environment from a medical perspective[.]" (Defs.' Cross Mot. Summ. J. Mem. Supp. at 24 n.4.)

Even viewing the evidence in the light most favorable to Plaintiffs, the Court cannot conclude that MCPS simply failed to seek any information about Q.K.'s SDS. The record directly contradicts this assertion. In the Prior Written Notice[20] issued to the Parents following the Second IEP Meeting, MCPS explained that the "team considered adding an area to the PLAAFP to address health needs due to the nature and impact on [Q.K's] functioning," and that the team "rejected this option until further documentation could be provided." (Pls.' Ex. P-34 at 1.) This evidence demonstrates that the Parents were on notice that they were required to submit more documentation in order to develop a health plan for Q.K., and Plaintiffs have not identified any documentation that they submitted in response. "Whether a challenged IEP provided a FAPE is based on the information available to the public school at the time the IEP was formulated," and the record supports the conclusion that MCPS had insufficient evidence to formulate a health plan. *M.L. v. Smith*, Civ. No. PX-16-3236, 2018 WL 3756722, at *7 (D. Md. Aug. 7, 2018).

The crux of Plaintiffs' argument here appears to be that the Final IEP failed to address any of Q.K.'s SDS symptoms. This is simply not supported by the record. Insofar as Q.K.'s SDS directly affects his educational and behavioral needs, as already discussed, the Final IEP contains a wide array of services that are responsive to the challenges Q.K. experiences with focus, organization, and processing of instructions—challenges that Q.K.'s mother identified as SDS symptoms she has observed in Q.K. (ALJ Hr'g Tr. Day 1 at 178:16–181:12.)

---

[20] As required by the IDEA, MCPS prepared and sent a Prior Written Notice to the Parents following each IEP team meeting that described the proposed changes to the IEP, the reasons for adopting or rejecting these changes, and describing the reasons for these conclusions. *See* 20 U.S.C. § 1415(c)(1).

### *ii. Q.K.'s Response to Lowell and Lab Programming*

Plaintiffs argue that the ALJ ignored evidence of Q.K.'s progress in both his current and previous educational placements: Lowell and Lab. (*See* Pls.' Mot. Summ. J. Mem. Supp. at 35–40.) This is demonstrably untrue. In great detail, the ALJ explained that Q.K.'s inability to make progress at Lowell did not show that Q.K.'s placement in the inclusion program at TPMS was inappropriate. (ALJ Decision at 72.) He explained that "Lowell is not a special education school, and did not provide special education services except for a private tutor that the Parents engaged for an hour a day[.]" (*Id.*) He also found the passage of time since Q.K. left Lowell diminished its significance: Q.K. was eight years old when he transferred to Lab, and at age thirteen (as of the time of the Hearing), "[h]is needs and abilities have changed with his maturation." (*Id.*) Further, the ALJ Decision expressly acknowledged that Q.K.'s "progress at the Lab School deserves weight in the analysis of whether the MCPS IEP offered him a FAPE[,]" but he concluded that "the Parents did not establish that he probably would fail to make comparable progress under" the Final IEP.[21] (*Id.*) Thus, the ALJ certainly considered Q.K.'s progress at past schools: he simply found that the significance of the evidence was limited given material differences between those programs and the Final IEP.

Rather, Plaintiffs' quarrel again seems to be with *how* the ALJ weighed the evidence, rather than whether he did so. Plaintiffs correctly point out that consideration of a student's "response to prior interventions and special education programming" is vital to determining whether an IEP has been reasonably calculated to offer the student an opportunity to make appropriate progress. (*Id.*

---

[21] Plaintiffs insist that they carried their burden to demonstrate that the Final IEP was inadequate because of ample evidence they submitted demonstrating Q.K.'s progress at Lab. (Pls.' Mot. Summ. J. Mem. Supp. at 39–40 (citing several exhibits).) The Court emphasizes that under the IDEA, MCPS was not required to provide an IEP that would enable him to make comparable progress to that Q.K. has made at Lab. Rather, MCPS's obligation was to "offer an IEP reasonably calculated to enable [Q.K.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999.

33

at 35.) However, prior interventions are less illuminating when they are materially dissimilar from those included in the IEP under review. The Court agrees with the ALJ's findings in this regard: Lowell School itself provided no special education services, while Lab School is a self-contained setting. Q.K.'s progress at Lab, and lack thereof at Lowell, were not especially helpful to predict the likelihood of Q.K.'s success in an inclusion setting. The Court agrees with the ALJ's thoughtful analysis on this point.

In light of Q.K.'s progress at prior schools in addition to the Final IEP's consideration of Q.K.'s needs and the detailed list of services it provides in response, the Court concludes that the Final IEP afforded Q.K. access to the FAPE that he is entitled to under the IDEA.

### iii.  Least Restrictive Environment

The IDEA's LRE requirement mandates that children with disabilities "are educated with children who are not disabled" to "the maximum extent appropriate." 20 U.S.C. § 1412(a)(1)(5). Thus, the "'mainstreaming of handicapped children into regular school programs . . . is not only a laudable goal but is also a requirement of the Act.'" *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 319 (4th Cir. 2004) (citing *DeVries v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989)). Given the IDEA's preference for educating children with disabilities alongside children without disabilities "to the maximum extent appropriate," the ALJ was correct to seriously consider whether placing Q.K. in an inclusion setting would still afford him access to a FAPE. Although the Parents appear to believe that Q.K. would be in a better position to make progress in the self-contained setting at Lab than in the inclusion setting at TPMS, the IDEA does not guarantee access to the "best possible education." *Fairfax Cnty. Sch. Bd. v. Knight*, 261 F. App'x 606, 608 (4th Cir. 2008) (citing *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 526–27 (4th Cir. 2002)); *see also M.C. v. Starr*, Civ. No. DKC-13-3617, 2014 WL 7404576, at *15 (D. Md. Dec.

29, 2014). Rather, so long as the Final IEP was reasonably calculated to enable Q.K. to make appropriate progress in light of his circumstances (and the Court has already concluded that it was), the IDEA requires that the services contemplated in the Final IEP be provided in the inclusion setting at TPMS. Because the Final IEP provides Q.K. with access to a FAPE in the LRE, the Court concludes that Defendants complied with the substantive requirements of the IDEA.

### d.  Reimbursement

The IDEA confers to a district court "the authority to order school authorities 'to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper'" under the IDEA. *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 950 (4th Cir. 1997) (citing *Burlington*, 471 U.S. at 369). Parents "may recover if (1) the proposed IEP was inadequate to offer the child a FAPE and (2) the private education services obtained by the parents were appropriate to the child's needs." *Lawson*, 354 F.3d at 320 (citing *Burlington*, 471 U.S. at 370). Although the Parents need not have previously enrolled Q.K. at MCPS in order to seek reimbursement for Lab tuition, *see Forest Grove*, 557 U.S. at 243, they still bore the burden to show that the Final IEP failed to provide Q.K. with a FAPE. Because the Court concludes that the Final IEP provided Q.K. access to a FAPE, it does not decide whether placement at Lab was "appropriate" to meet Q.K.'s needs.

### IV.  Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 16) is DENIED and Defendants' Cross Motion for Summary Judgment (ECF No. 17) is GRANTED.

DATED this _28_ day of March, 2022.

BY THE COURT:

James K. Bredar
Chief Judge